UNITED STATES v. OHIO OIL CO. et al.

(District Court, D. Wyoming. January 31, 1916.)

No. 852.

1. MINES AND MINERALS ☞17(1)—LOCATION—VALIDITY.

A location of a mining claim is not valid until there is a discovery, in case of a lode claim, of a vein or lode containing mineral, or, in case of a placer claim, a discovery of petroleum or other mineral within its limits.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24, 27, 28.]

2. MINES AND MINERALS ☞17(1)—LOCATION—VALIDITY.

Upon discovery of minerals within the claim, the location becomes valid, although in case of a lode claim the finding of float rock, or in case of a placer claim the mere indications of mineral or oil, is insufficient.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24, 27, 28.]

3. MINES AND MINERALS ☞38(22)—LOCATION—DISCOVERY.

Whether there has been a discovery of minerals within a claim, so as to perfect the location, is a question of fact, depending on the circumstances of the particular case.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 108.]

4. MINES AND MINERALS ☞17(1)—LOCATION—VALIDITY.

A discovery of minerals sufficient to perfect location of a claim must be such a discovery that a person of ordinary prudence would be justified in further expenditure of his labor and means with a reasonable prospect of success, either in developing a valuable mine, or, in case of an oil claim, of securing oil in paying quantities, and the question cannot be left to the mere arbitrary will of the locator.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24, 27, 28.]

5. MINES AND MINERALS ☞16—"PLACER CLAIM"—"LODE CLAIM."

The term "placer claim" means ground within definite boundaries which contains mineral or valuable mineral deposits not in place, while the term "lode" or "vein," used in the statute relating to lode claims, means lines or aggregations of mineral imbedded in quartz or other rock in place.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 21–23.

For other definitions, see Words and Phrases, First and Second Series, Placer Location; Second Series, Lode Location.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. MINES AND MINERALS ⊚⟶38(17)—LOCATION—DISCOVERY—EVIDENCE—SUF-
FICIENCY.

In a suit to withdraw mineral lands from appropriation, evidence *held*
to warrant a finding that the locator of claims on such land had made a
discovery of oil previous to the withdrawal order sufficient to validate
the claim, because justifying a person of ordinary prudence in further
expenditure of labor with prospects of success in securing oil in com-
mercial quantities.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 103.]

7. MINES AND MINERALS ⊚⟶36—LOCATION—WITHDRAWAL.

Under Act June 25, 1910, c. 421, § 2, 36 Stat. 847, as amended by Act
Aug. 24, 1912, c. 369, 37 Stat. 497 (Comp. St. 1913, § 4524), declaring that
all lands withdrawn from appropriation shall be open to exploration, dis-
covery, and occupation under the mining laws, so far as the same apply
to metalliferous minerals, but that the rights of any person who at the
date of any order of withdrawal is a bona fide occupant or claimant of
oil or gas bearing lands, and who at such date is in the diligent prosecu-
tion of work leading to the discovery of oil and gas, shall not be affected
or impaired, so long as such occupant shall continue in such diligent pros-
ecution, labor performed or improvements made at a distance from a
claim on oil-bearing lands, intended to facilitate work on the claim, such
as the construction of a camp or the building of roads, falls within the
statute.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

8. MINES AND MINERALS ⊚⟶38(20)—LOCATION—LABOR—PERFORMANCE.

In a proceeding to forfeit locations on mineral land withdrawn from
appropriation, evidence *held* to show the performance of labor and the
making of improvements sufficient, within Act June 25, 1910, c. 421, § 2,
as amended by Act Aug. 24, 1912, c. 369, to hold the claim.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 106.]

In Equity. Suit by the United States against the Ohio Oil Company
and others. Decree for defendants.

T. W. Gregory, Atty. Gen., of Washington, D. C., C. L. Rigdon,
U. S. Dist. Atty., of Cheyenne, Wyo., and E. J. Justice and F. P. Hob-
good, Jr., Sp. Asst. Attys. Gen., both of Greensboro, N. C., for the
United States.

Eugene J. Sullivan, of Basin, Wyo., and Burke & Riner, of
Cheyenne, Wyo., for defendants Ohio Oil Co. and Grass Creek Oil
& Gas Co.

C. A. Zaring, of Basin, Wyo., for defendants Kent and others.

RINER, District Judge. This is a suit in equity, brought by the
United States against the defendants named in the bill, principally the
Ohio Oil Company, to have the lands in controversy, viz., the N. W. ¼
of section 18, township 46 north, of range 98 west of the sixth principal
meridian, and the E. ½ of the S. W. ¼ of said section, now in the pos-
session of the defendant the Ohio Oil Company, declared by decree of
the court to have been at all times from and after the 6th day of May,
1914 (the date of the withdrawal order issued by the President), law-
fully withdrawn from mineral exploration and all forms of location,
settlement, selection, filing, entry, or disposal under the mineral and
nonmineral public land laws of the United States.

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The bill further prays that the defendants and each of them be adjudged and decreed to have no estate, right, title, interest, or claim in or to said lands, or any part thereof, or in or to any mineral or minerals or mineral deposits contained therein, or any part thereof, and that all and singular said lands, together with all the minerals and mineral deposits, including petroleum or mineral oil and gas therein contained, be adjudged and decreed to be the perfect property of the plaintiff, free and clear of the claims of said defendants, and each and every of them. There is also a prayer for an injunction and accounting.

To this bill the defendants answered, asserting their right to the land in controversy by reason of certain mineral locations which they claim were made pursuant to the requirements of the public land laws of the United States relating to mineral entries.

Under the issues made by the pleadings, two questions are presented for determination by the court: First. Was there a discovery of mineral upon the lands in controversy prior to the date of the withdrawal order? Second. Were the defendants, at the date of the withdrawal order, viz., the 6th of May, 1914, in the diligent prosecution of work leading to discovery on the claims, or either of them, and thereafter continued in the diligent prosecution of such work? These questions will be noticed in the order above stated.

[1-3] No one, I take it, will contend that under the mining laws of the United States a valid location of a mining claim, if it be a lode claim, can be made until there is a discovery of a vein or lode containing mineral within the limits of the claim located, and, in case of a placer claim, a discovery of petroleum or other mineral within the limits of the claim. And we may assume, further, in view of the decisions upon the point, that no one will claim that mere indications of mineral constitute a discovery within the meaning of that term as used in the law. Such indications, as is well stated by an eminent jurist, do not constitute the discovery of the mineral itself. In the case of a lode claim it is the finding of the mineral in the rock in place, as distinguished from float rock, that constitutes a discovery; and in the case of a placer claim it is because of the finding of petroleum or other mineral in or upon the ground, and so situated as to constitute a part of it, that a discovery can be said to have been made. The mineral need not be of commercial value, it is true; for, as said by Judge Hawley, in speaking of a lode claim, in Book v. Mining Co. (C. C.) 58 Fed. 106:

"When the locator finds rock in place, containing mineral, he has made a discovery, within the meaning of the statute, whether the rock or earth is rich or poor, whether it assays high or low."

But in all cases it must be a discovery of mineral, as distinguished from mere indications of mineral, and this rule, I think, applies equally to lode and placer claims. In ascertaining whether or not a discovery was made, the question in any given case must be determined with reference to the special facts and conditions shown to exist in the particular mining district where the claim under consideration is located, in connection with the facts of the case before the court. Thus it would not do to say that the discovery of seepage oil upon a mining location could not in any case constitute a discovery; on the other hand,

it would be equally erroneous to say that in every case where seepage. oil is found upon a mining location that it constitutes a discovery. And this rule accounts for some apparent difference of opinion among the courts as to what constitutes a discovery. I think, however, a careful analysis of most of the cases where these apparent differences are found will show that there is no substantial difference of opinion as to the correctness of this rule; but its application to the facts before the court in each case, which necessarily differ in different cases, cause what might seem at first blush to be a difference of opinion as to the rule itself. It is always, in every case, a question of fact, to be determined by the court or jury, as the case may be, whether a discovery has been made or exists within the limits of the claim or location in controversy.

[4-6] The affirmative evidence upon the question of discovery in this case is found in the testimony of the witnesses Edgitt, Loving, and Davis. Their testimony is to the effect that on the 30th of July, 1913, they commenced drilling a prospect well on the E. ½ of the S. W. ¼ of section 18; that that well was drilled to a depth of 35 feet, and that oil was discovered therein; that on the 2d of August they began drilling a well on the N. W. ¼ of section 18, which well was drilled to a depth of 57 feet, and that they found oil therein. These wells were both finished in August, 1913. The witnesses are positive in their statements as to finding oil, and two of them, at least, Mr. Edgitt and Mr. Davis, were men of experience in drilling oil wells. These two witnesses testified, not only to the fact that they found oil, but that the oil found by them was of sufficient quantity and quality to justify a person of ordinary prudence in making further expenditures of money and labor, with a reasonable prospect of success in developing a valuable deposit of oil, and in this view they are sustained by the subsequent development of the property. The testimony of these three witnesses was given in a straightforward manner, both upon direct and cross examination, and bears the impress of truth.

The testimony on behalf of the government on this question is all of a negative character. Mr. Walker, a witness for the government, testified that he was there in the following May, nine or ten months after these drill holes were put in; that he examined them by dropping a line, to which was attached a weighted can, to the bottom of the wells; that in one he found no indications of oil; that in the other there was an oily substance, more like gasoline or kerosene, but that it was not the·crude oil found in that district. There were some other witnesses whose testimony was to about the same effect. Then there was the evidence of Mr. Rath and Mr. Durham, special agents of the Land Department, to the effect in June and July of 1915, almost two years after these drill holes were put down, and after a number of commercial wells had been brought in in the district, some upon the land in controversy and others near there, that they put down test holes near the test holes put down by Edgitt and his associates, but discovered no oil. Other than this, no effort was made by the government to impeach or discredit the testimony of Edgitt, Loving, and Davis, who testified positively that they put these wells down and that they found oil therein.

Applying the ordinary rules of evidence governing the weight to be

attached to affirmative and negative testimony, the court feels bound to find that oil was taken from and was found in the test wells or holes on the land in controversy, drilled by Edgitt, Loving, and Davis, as testified to by these witnesses.

In order to determine what constitutes a discovery, within the meaning of that term as used and understood in the law, it is important to bear in mind the difference between a placer claim and a lode claim. The term "placer claim," as I understand it, means ground within definite boundaries which contains mineral, ground that includes valuable deposits not in place; while by the term "veins" or "lodes," as, used in the statute, are meant lines or aggregations of mineral imbedded in quartz or other rock in place. In both placer and lode claims, however, there must, as already suggested, be a finding of mineral, and it must be of such character that a person of ordinary prudence would be justified in further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine, or, if it be oil, oil in commercial quantities. It was held in some of the earlier cases that a mere willingness on the part of the locator to further expend his labor and means was a fair criterion; but this rule is no longer accepted. A very clear statement of the true rule as now recognized and enforced by the courts is found in Lindley on Mines (1st Ed.) § 336, where it is said:

"But it would seem that the question should not be left to the arbitrary will of the locator. Willingness, unless evidenced by actual exploitation, would be a mere mental state, which could not be satisfactorily proved. The facts which are within the observation of the discoverer, and which induced him to locate, should be such as would justify a man of ordinary prudence, not necessarily a skilled miner, in the expenditure of his time and money in the development of the property."

Or, as stated by Mr. Justice Brewer, in Chrisman v. Miller, 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770:

"There must be such a discovery of mineral as gives reasonable evidence of the fact, either that there is a vein or lode carrying the precious mineral, or, if it be claimed as placer ground, that it is valuable for such mining."

The case last cited went up from the state court of the state of California upon a finding made by the trial court, and affirmed by the Supreme Court of that state, to the effect that there had been no sufficient discovery of oil upon the lands in controversy, and that the plaintiffs in error did not make an attempted location in good faith, and never did any work upon the tract. These questions, as we have seen, being questions of fact found by the state court, were, under the rule announced by the Supreme Court of the United States, conclusive in that court. And it clearly appears from the above quotation from this case that it does not lay down any other or different rule from that hereinbefore referred to.

Many cases bearing upon this question were called to the court's attention at the argument. These cases have all, with the exception of two, been examined by the court; but to attempt to review them would extend this memorandum to unwarranted length. I will, however, briefly notice a few of them.

·The case of Butte Oil Co., 40 Land Dec. 602, is a case where there was a small seepage of oil on the surface of the claim; but in that case the geological evidence upon which the decision was based tended to establish the fact that the source of the oil from which the seepage came might be and probably was elsewhere than within the limits of the claim. And in view of this evidence First Assistant Secretary Adams held that the small seepage of oil found upon the ground and a slight flow of natural gas, insufficient for commercial purposes and without value, from a drilled well which failed to develop oil, were not sufficient to constitute a discovery of oil as a basis for a placer mining location; but it is said in the course of the opinion in that case:

"It is not necessary in the decision of this case to hold that under no conceivable circumstances could there be such seepages or flows of oil on the surface of land as, when found by one attempting to locate a mining claim, would constitute a discovery"

—thus recognizing that each case must be determined upon the facts then before the court. The case is not at all at variance with the rule announced by Judge Ross in Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 673. In that case the learned judge, after stating what was a sufficient discovery of a lode claim, said:

"So, in respect to placer claims, if a competent locator actually finds upon unappropriated public land petroleum or other mineral in or upon the ground, and so situated as to constitute a part of it, it is a sufficient discovery, within the meaning of the statute, to justify a location under the law, without waiting to ascertain by exploration whether the ground contains the mineral in sufficient quantities to pay."

Another case upon which counsel for the government seem to place some reliance is that of Bay v. Oklahoma Southern Gas, Oil & Mining Co., 13 Okl. 425, 73 Pac. 936. This case was a controversy between a homestead claimant and the locator of a mining claim. The case was not argued, as shown by the opinion, where it is said:

"The defendants in error have not favored us with a brief, and we are left to the record alone to ascertain the grounds for the action of the trial court. In cases of this character, where the defendant in error has sought and secured the favorable action of the trial court, and relieving him from the operation of a prohibitory order, and the adverse party brings the case to this court for review, and the defendant in error does not manifest a sufficient interest in the result to brief the case for the benefit of the reviewing court, we shall not go into any critical examination of the record or extensive investigation of authorities in order to sustain the judgment appealed from. If the plaintiff in error makes a prima facie showing of error, and the case is one affecting no public interest, we will reverse the judgment."

The facts as disclosed by the opinion are in substance as follows: On the 15th day of November, 1901, Bay made a homestead entry on the land in controversy, and on that date settled upon the land, and remained in peaceable possession thereof until the 17th day of July, 1902, when the defendants in error moved a drill upon the land and drilled a well 43 feet deep, at which depth they found oil and took out 1½ gallons of oil, when the work was stopped by a temporary injunction restraining them from further trespassing upon the land.

This restraining order was issued by the probate judge, the district judge being absent, as authorized by the laws of that state. On August 20th of the same year the district judge, upon a hearing, dissolved the temporary injunction, and it was from this last order dissolving the temporary injunction that the appeal was taken.

In support of the right to take the land as a mining location, the defendants in error introduced in evidence in the district court a notice, purporting to have been given July 9, 1901, and filed with the register of deeds, for the county in which the land was situate, on the 26th of August, 1901, in which notice they claimed the tract as a placer mining claim. In opposition to this showing made by the defendants in error, the plaintiff in error filed his own and eight other affidavits, all to the effect that the parties making the affidavits had examined the land in question carefully, and that it was all prairie land, covered with sod and grass, at the time of the homestead entry, and that there were no oil seepages, or seeps or indications of oil upon the land. By congressional enactment in 1891 all lands in Oklahoma were declared to be agricultural lands, and proof of the nonmineral character thereof was not required in making homestead entry. This statute applied to all lands in Oklahoma, except certain lands thereafter acquired, by treaty, from certain Indian tribes. The last-named lands, where they contained valuable mineral deposits, were open to location and entry under the mining laws of the United States. On the 3d of March, 1901, Congress passed an act providing, among other things, that the lands to be opened to settlement and entry under the acts of Congress ratifying the agreements or treaties with the Indians should be so opened by proclamation of the President, and, to avoid contests or conflict of claims, that the President's proclamation should prescribe the manner in which settlement might be made upon the lands, and that:

"No person shall be permitted to settle upon, occupy or enter any of said lands except as prescribed in such proclamation until after the expiration of sixty days from the time when the same are open to settlement and entry." Act March 3, 1901, c. 846, § 1, 31 Stat. 1093.

It is to be observed that under this statute no person was permitted, whether seeking to discover minerals or to acquire settlement as a homestead, to enter or occupy the lands until 60 days after the time fixed by the President's proclamation for opening the same to settlement and entry had expired. The President's proclamation, which was issued on the 4th of July, 1901, fixed August 6, 1901, as the day for the opening of these lands to settlement. This being the situation, and there having been no discovery of oil made prior to the homestead entry, the Supreme Court of Oklahoma said:

"Those who were qualified to make mining locations and obtain title to public lands were not permitted to occupy any of these lands for the purpose of discovering minerals, prospecting for oil, or making mineral locations until 60 days after August 6, 1901."

And further:

"All lands containing petroleum are not subject to entry under the mineral laws, but only such as are 'chiefly valuable therefor'; and this is a subject

of proof. If the oil is in such limited quantities that it cannot be worked at a profit, then it cannot be said to be 'chiefly valuable' for its oil. Where a homestead entry has been made in good faith, after an examination by the entryman of the surface indications, and no evidences of minerals or oils discovered, the discovery of minerals or oils in such land afterwards will not necessarily defeat his right to the land. * * * The homestead entry may be attacked by contest or protest, and when the character of the land as mineral or nonmineral is put in issue it must be determined by the Land Department, and the findings of that department on questions of fact are, as a general rule, conclusive on the courts. But this court has frequently held that a homestead entry entitles the entryman to the exclusive possession of the land embraced in his entry as against all persons except one asserting a superior or prior right. * * * And injunction is a proper remedy to prevent trespassers and interlopers from interfering with the entryman's possession."

The foregoing and some further pertinent remarks found in the opinion, but not quoted, would seem to completely dispose of the questions before the court under the issues presented by the pleadings in that case. The court, however, near the close of its opinion, and after quoting the well-recognized rule that no location of a lode mining claim can be made until discovery of the vein or lode within the limits of the claim located, proceeds to say that:

This "means, when applied to placer mining for petroleum, that no location can be made until the discovery of the vein or deposit from which the oil is drawn."

This would mean, I take it, that no discovery in the case of oil would be recognized as such until the oil-bearing sands had been reached, and, if applied in the case of a gold placer mine, there would be no discovery until the bedrock (upon which in almost every instance the values are found) was reached. I find no such rule recognized by any other court.

The object of the law in requiring the discovery to precede the location of a mining claim is to assure good faith on the part of the locator and to prevent frauds upon the government; hence the discovery, as stated by Mr. Justice Brewer in Chrisman v. Miller, must be such as to give reasonable evidence that the ground claimed as placer ground is valuable for such mining, but beyond that the locator is not required to go.

A case more directly in point is that of Lange v. Robinson, 148 Fed. 799, 79 C. C. A. 1, a gold placer mining location. The court, after stating, as above suggested, that where there is placer gold it is almost a universal rule "that the 'pay streak,' so called, is in and upon, or near, the bedrock," and further stating that the bedrock in that particular case was from 125 to 150 feet below the surface, and, further, that the overlying ground was, of no value, in that it did not contain sufficient gold to pay for working it, proceeds to state the evidence upon the question as follows:

"The plaintiff is a miner of many years' experience, and testified, in substance, that before making his location he washed upon each claim a few pie plates of the sediment deposited in and along the sides of the creek upon which the claims are located, and found in the several washings from two to six fine colors of gold. This was all of the gold actually discovered by him before he made the locations. The plaintiff also testified that his belief that

there was gold on the bedrock of the claims located by him was based upon the colors which he had found."

And then, after quoting a question and the answer of another witness, who testified that the gold thus taken was in his judgment sufficient to justify a reasonably prudent man in the expending of time and money in exploring the ground, the court proceeds:

"It will be noticed from the foregoing statement of facts that prior to making the locations under consideration plaintiff did not actually discover gold in paying quantities upon the claim located, but he did find some small particles of gold therein. Was this sufficient to give to the plaintiff the right to locate as placer mining claims the lands upon which this gold was found?"

And after a discussion and review of several cases, the court reached the conclusion that the plaintiff had made a sufficient discovery of gold upon the lands in controversy to entitle him to make a valid location of the same as placer claims under the laws of the United States.

Applying the principles announced in this and other cases (to some of which I have referred) to the evidence in this case, I think the lessors of the defendant the Ohio Oil Company made a sufficient discovery of oil on the claims in controversy to entitle them to make valid locations of the same as placer claims. There can be no question, I think, as to the good faith of these locators, for within a year after the date of discovery two commercial wells were brought in upon these claims at an expense of more than $20,000.

[7, 8] It might well be said that the conclusion reached by the court on the first question renders it unnecessary to consider or decide the second question suggested at the beginning of this memorandum, viz.: Were the defendants, at the date of the order of withdrawal, bona fide occupants or claimants of the land in controversy, and were they on the 6th of May, 1914, the date of the withdrawal order made by the President, in the diligent prosecution of work leading to the discovery of oil? But as the question was raised and fully argued, a large part of the briefs of counsel being devoted to a discussion of it, an expression of the court's views and a finding should, perhaps, be made thereon, as well as upon the first question. The act of Congress of June 25, 1910, as amended by the act of August 24, 1912, reads as follows:

"Sec. 2. That all lands withdrawn under the provisions of this act shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals: Provided, that the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands and who, at such date, is in the diligent prosecution of work leading to the discovery of oil or gas, shall not be affected or impaired by such order so long as such occupant or claimant shall continue in diligent prosecution of said work."

I think there can be no question under the evidence but what the defendants were, at the date of the withdrawal order, bona fide claimants of the lands in controversy, and in actual occupancy of the lands. The evidence shows that in April, 1914, Mr. Harrison, attorney in fact for the locators, in company with Mr. Hurley and Mr. McFadden, two representatives of the defendant the Ohio Oil Company, examined

the lands; that in the last part of April the representatives of the Ohio Oil Company entered into an oral agreement with Mr. Harrison to lease the premises and proceed with the drilling of wells for oil in commercial quantities. Mr. McFadden, who was the Wyoming superintendent of the defendant the Ohio Oil Company, at once took steps to carry out this agreement. His testimony, which is undisputed, is to the effect that the defendant the Ohio Oil Company at once employed Virgil Jackson, and left him in charge of the claims; that he followed this up by directing that certain material owned by the defendant and stored at Casper be loaded on the cars for shipment to Kirbey, the nearest railroad point to the lands in controversy; that on the same day, May 4th, he ordered lumber from the Clark Lumber Company to be delivered on the lands in controversy, and employed a carpenter to construct certain necessary buildings, all of which was done; that on the day following, May 5th, he entered into a contract with a man by the name of R. E. Good to drill wells upon the claims in controversy which was subsequently done, the first well being brought in on the 24th day of July.

The record shows without dispute that prior to the 6th of May, 1914, the defendant the Ohio Oil Company had, pursuant to the oral contract made with Mr. Harrison, expended and obligated itself, for materials necessary to the work of drilling wells upon the lands in controversy, in the sum of $2,000 or more; that on the 6th of May, 1914, Mr. Harrison was in possession of the land, had established a camp, and that materials ordered at Thermopolis on the 5th of May arrived on the ground on the 7th, and the construction of the permanent camp was at once commenced; that this was promptly followed up by sinking two commercial wells, one on each of the claims, at an expense of something more than $22,000; that in addition to that the defendants erected a steel tank on the land for storing oil derived from the wells on the claims in suit, at an expense of something like $15,000; and I think the evidence shows that this work was done and the expenditures made for the benefit of the several claims.

It has been so often decided that labor and improvements within the meaning of the statute are deemed to have been had on a mining claim when the labor is performed or the improvements are made for its development, that is, to facilitate the extraction of the mineral the claim may contain, though in fact such labor and improvements be at a distance from the claim, that the citation of authorities seem unnecessary. Thus, it has been held that the building of roads and the like for the purpose of aiding in the development of mining property, although not within the limits of the claim itself, was a sufficient compliance with the statute requiring assessment work to be done.

Without prolonging this memorandum by reviewing the cases or the testimony relating to this question, it is sufficient to say that I have examined the cases called to my attention in the briefs of counsel, and have read at length the evidence contained in the record, and have reached the conclusion that the defendants were bona fide occupants and claimants of the oil-bearing lands in controversy, and were en-

gaged in the diligent prosecution of the work leading to the discovery of oil in commercial quantities on said lands at the date of the withdrawal order made by the President, to wit, the 6th day of May, 1914.

Findings will be made to conform to the views just stated, and a decree entered thereon.